Our first case today is 2017-2356, Sharpe v. DOJ. Mr. Burns, please proceed. Yes, Your Honor. Good morning. May it please the Court, I think the briefs in this case outline the evidentiary issues that we bring to the Court to raise the overall concern that the ALJ's rulings in the underlying case were not supported by substantial evidence. Now, we know that this Court is reluctant to disturb evidentiary rulings, but in this particular case, the number of rulings that go to the core of the issues of discrimination under the USERRA are significant. As we pointed out in our brief, the reason – I'm not going to regurgitate the brief. I want to point out why they're significant. Firstly, as the opinion below expresses, Special Agent-in-Charge Sherman, when he was talking about his selection process, the first time he talked about why he made those selections was at his hearing. We had argued below, and it's in the Court opinion, that the agency is acknowledged to raise no affirmative defenses to the issue of USERRA discrimination in this case. It simply litigated on the merits as to whether or not the conduct in denying Mr. Sharp promotions, in particular in this case, amounted to a form of discrimination. And the significance of that is that because the agency was not forced to provide information in advance, it was relying upon testimony at the hearing from Mr. Sherman that explained for the first time why he had made his decisions. As the record below showed, and as we note in our brief, Special Agents-in-Charge, when selecting individuals, aren't required to do comparative analysis, aren't required to maintain notes, aren't required to interview people. They simply make a recommendation to the career board for the Drug Enforcement Administration, which in virtually every case, except when there's a transfer coming in from overseas or a hardship, agrees to the selection decided by what they call the Special Agent-in-Charge or SAC. Except when, in isolated cases, that individual has usually been chosen for another position. Can I ask you a procedural question? Certainly. And I should know the answer to this by now. But did you get an opportunity to depose Mr. Sherman before the hearing? Yes, we did. Yes, we did. And did you ask him at the deposition questions about the Tversky email? The Tversky? Yes, we did. And do we have the record of that? We do not have the record of that because he said he was consistent with his testimony that he said that that was his personal opinion and that he took no action against him because he believed the email was his personal opinion. When you say his personal opinion, you mean Tversky's personal opinion? Mr. Tversky's. And I might add, and I want to – Well, wait. So we don't have the – was it part of the record below for the AJ when the AJ was making the decision? Yes. She denied the exhibit and she denied any testimony on the exhibit. No, no. I understand that she denied the exhibit, i.e. the email and the testimony. So entered into the record, for example, wasn't his deposition testimony about the email. That was denied as – that would have not been allowed as well since he was testifying. Yes. So it wasn't – it didn't end up being part of the record below at all. Well, except to the extent that the conversation was literally recorded before the ALJ and a proffer was made as to what he would say. The email was basically one line and it's recorded in our appendix and it's cited in the appendix in the exhibit of exactly what the terminology was. She would not allow us to enter it. One of the reasons that I guess I'm focused on this is that it seems to me on its face a little bit surprising that if the following happened, this would be a little bit surprising, which is you're trying to lay a foundation for the relevance of the Tomaski email and you're precluded from asking the questions to establish that foundation. But now you're telling me that there was deposition testimony, which perhaps you could have said to your administrative judge, here's the foundation in the earlier deposition testimony. No, because all that – all he did in his deposition was he regurgitated what he said at the hearing, which is he said – and at that point, there was – we were trying to call – Which came first? The deposition. Oh, okay. There's a little bit of a glitch here because there's an argument about calling Mr. Tomaski. We had tried to call Mr. Tomaski as we referenced. The agency provided us the address for a shopping mall. One fact that doesn't come to the record that happened was that Mr. Tomaski died by suicide, so we weren't obviously able to call him. But in terms of Mr. Sherman's hostility to military or not, it's more what Mr. Sherman understood about the email than what Tomaski was thinking. Absolutely. So I guess I'm a little confused about the cutting off of inquiry to Sherman to lay a foundation for the testimony. I was confused as well. I kept trying to raise it with the administrative law judge that there were a number of things she was saying that were simply incorrect. She said this was hearsay under the federal rules. Well, they don't apply, but even if they did, it's a statement of a party opponent that goes directly to the core of the discriminatory and retaliatory animus, which since he makes the statement the day after they file their joint appeal and he calls a military reservist a coward. Oh, a timeout. I didn't appreciate this. Is this – you said they filed a joint appeal. Are you talking about Sorrell and Sharp? All of them did. It's in the record, Your Honor. They filed – they originally filed – it's also in the court opinion that they originally filed – 16 reservists filed an action against the DEA arguing for class status. That was denied by the administrative law judge and not appealed. There was an attempt to file a joint return – a joint claim for the San Diego reservists. Did the same A.J. hear all of these claims? No, no. But the way the MSPB operates is that the class certification is denied by the initial judge who heard – there was a special judge, the administrative law judge, the senior administrative law judge in San Francisco denied the class and the joint appeal, and then we had to file individual appeals for each of these reservists. So, timeout. I just kind of want to make sure I understand the facts. So, did Sorrell actually work in the same San Diego office with Mr. Sharp? Yes. Okay. And the two of them were two of the 16 reservists that filed simultaneously? Yes. Okay. And then you tried – or there was an attempt to then, after a class action was denied, to have a joint claim that would have included both Sorrell and Sharp, and that was also denied? Yes. Okay. And Mr. Sherman is in the chain of command above both Mr. Sorrell and Mr. Sharp. Yes, he's two levels – two to three levels up. And Tomaski is actually the deputy directly above Sorrell, and is he also above Sharp? No. Where's his – I'm trying to understand that. Tomaski is an assistant special agent in charge. Sorrell would have a group supervisor who would be a GS-14. That would be the supervisory positions that Mr. Sharp was applying for. Then there would be his assistant special agent in charge, which would mean Mr. Tomaski. There were three or four special agents in charge in San Diego. They directly reported to Mr. Sherman. Okay. So Tomaski directly reported to Sherman. Was Tomaski in a chain where he was in charge of Mr. Sharp or Mr. Sorrell? Yes. He was in charge of Mr. Sorrell's, and he was also one of the – the officials relied upon on some of the applications for positions that Mr. Sherman made determinations on because Mr. Sherman testified that it's in the record that he relied on the comments from his assistant special agents in charge, which would have included Mr. Tomaski. Okay. So now – I'm sorry. You said Tomaski was on some of the information Sherman was using. Are you referring to some of the information for Mr. Sharp's applications? Yes. There's a reference in the record to one of the positions Mr. Sharp applied to that Mr. Tomaski was directly involved in making a decision on. So I realize that it's a little complicated because the problem with our record, in all honesty, is that I am trying to tell you about events that I was precluded from presenting at the hearing. That's the whole point. Can I ask – I'm going to ask you some things that weren't part of the record. Sure. But you say now there was a deposition about this, so it's a matter of fact. And I assume that we could – if we requested the record, would we be able to get the deposition? Certainly. Is that part of it? I don't know if it's not the record to the proceeding. Maybe it's in the overall record of the case. But my question is, was there any question that Mr. Tomaski's email to Mr. Sorrell was absolutely about the USERRA complaint? Yes. It was sent the day after. No, no. But did Mr. Sherman, in his deposition, acknowledge, admit, or acquiesce in the idea that, yes, this email was about the USERRA complaint? Or did he hedge and say, I have no idea what this email was about? If I recall the deposition correctly, Mr. Sherman was made aware – Mr. Sherman commented that it was sent the day after two reservists appeared on national television or in a national news article to discuss USERRA and anti-reservist attitudes in the DEA, and that Tomaski's email was a direct attack on Mr. Sorrell's, who was one of those reservists in his immediate chain, for bringing that complaint. And he called him a coward for doing so. I think the problem with it is, again, I am trying to tell – Well, one of my problems with it is if Mr. Sherman is – I supervise a number of people here. And if one of them emailed another one calling them a nasty name, I'd have them both in my office sitting down. And I'd say, this is not professional. This can't occur in my workplace. This is not appropriate. Are you suggesting to me that Mr. Sherman in his deposition suggested he didn't do any of that? He didn't do any of it. Instead, he said, well, that's just Tomaski's personal impression about this particular USERRA claimant, and he's entitled to send through government email – this is not a private Gmail account – and he's in the chain of command above this person. So he is a supervisor, and he's – that in Sherman's view, there was no problem, at least according to the deposition, there was no problem with Mr. Tomaski expressing his personal views and hatred towards one of his subordinate employees. No, that was fine. That was his personal opinion. He didn't do anything about it. This is as close to Jack Nicholson and a few good men as I can imagine. Yeah. Well, that was – again, with all due respect, that has been my point. It's like, okay, it's one thing to lose an appeal because the administrative law judge took into account everything you said and said, I disagree with this. But the thumb was a bit on the scales for us here. Not only did Tomaski say this email, which Sherman never – not only addressed, he never attacked or never referred from – Why don't you save the rest of your time for rebuttal and let us hear from you? Okay. Certainly. Thank you. Good morning, Your Honors, and may it please the Court. I do want to start by acknowledging or pointing out for the Court that some of, at least, Mr. Sherman's deposition testimony is included at Joint Appendix pages 1435. And it may not be all of the deposition testimony. So 1451. Is any of it about the Tomaski email? I did not see any references to the email or – but that was not included in any of the – Mr. Sharp's briefing at all. So that may be why it's not included. Can you address what seems strange to me, so I would understand? It feels as though inquiry to Mr. Sherman about what he understood the Tomaski email to mean, what it might have indicated about his, Deputy Tomaski's attitude, was cut off. And yet that's the very inquiry that would establish the facts of potential relevance to Mr. Sherman's mental state and the potential foundation for actually then introducing the email, although Mr. Sherman's reaction to it is at least as important as the email itself. How could that – what am I misunderstanding either about the facts or the legal consequences of that? Well, first, Your Honor, there were pre-hearing submissions, so before the administrative judge rendered her decision concerning relevance. And so at that time, the administrative judge was at least aware of why Mr. Sharp wanted to proffer this evidence. Did the Sherman deposition take place before the pre-hearing conference at which the A.J. excluded the email? Yes, the deposition took place before the hearing and the pre-hearing submissions in which the government filed something to exclude the email on relevance grounds. So arguments had been exchanged about the relevance of the email. But you didn't just exclude the email. Didn't you also move to exclude Mr. Sharp's ability to ask Mr. Sherman any questions about the email? Yes, Your Honor, that is correct. But the administrative judge did not preclude Mr. Sharp from asking a general line of questions about Mr. Sherman's hostility towards reservists. And that is something that's at Joint Appendix page 2029, I believe. The administrative judge said, aren't we here to learn about whether Mr. Sherman has any hostility toward military reservists? So he wasn't precluded from asking that particular line of questioning. Wouldn't that include, as an example, this email where apparently Sherman may have done nothing in response to this attack on Sorrells by Tomaski? Well, the administrative judge was concerned about two things. One of them you will see from the hearing testimony is that she was concerned about Mr. Sharp attempting to litigate cases that involved other employees. She was trying to sort of narrow it to making sure, this is a second point, Mr. Sharp's burden here, which the central inquiry is whether Mr. Sherman exhibited any anti-military hostility towards him. Can you turn to page 32 of her opinion, please? And can you read out loud the last full sentence on the bottom of page 32? I also consider whether there was any hostility by Sherman towards the appellants or others, military, or USARA activity. So she expressly made a fact-finding that as part of her consideration about whether it was likely that Sherman was discriminating against this particular military man, she says, I also considered as part of that fact-finding whether Mr. Sherman had hostility not just towards appellant, but towards other military or USARA activity by others. So how is it that this email and Mr. Sherman's reaction to it doesn't go right to the heart of this fact-finding? She said this was an important part of what she considered in her decision-making. So your answer to Judge Chen was, oh, well, this should only be about Mr. Sharp. This shouldn't be about litigating other people's stuff. And I get that idea of how you'd want to limit a case. But here she's saying she isn't just considering whether Sherman is discriminating against Sharp. She's considering whether Sherman has a hostility towards other military men or other USARA filers. Wouldn't this email and questioning Mr. Sherman about this email go directly to that second part of her sentence? Well, Mr. Sharp, again, was not precluded from asking Mr. Sherman, have you – how do you feel about other military reservists who work in your unit? I understand that this email may have provided evidence of that. But on its face, it doesn't. It doesn't say anything about his – I'm not just talking about the email, though. I'm talking about he was also precluded from asking Mr. Sherman, for example, how Mr. Sherman dealt with it. I'm a manager. You may be a manager. If you have one subordinate employee that says something completely inappropriate using his work email to another subordinate employee and you're copied on it as a manager, you now have an obligation, it seems to me, to react to that and to say it's not appropriate to use your government email for these kinds of things. And it seems from the deposition testimony that Sherman didn't do anything like that, but that Mr. Sharp wasn't permitted to introduce that evidence in this hearing to show that Mr. Sherman might just go along with this sort of behavior. Maybe he shares in Tomosky's view, or at a minimum, he is uninterested in telling people they can't be hostile to others about USARA activities. Well, there is nothing in the record that establishes that anything in the email concerns military reservists. It does use a derogatory term, coward, but it doesn't reference – Well, but Mr. – and we don't know because it's not part of the record, but Mr. Sharp's attorney suggested that in the deposition it was Mr. Sherman that connected this email directly to the earlier – the day before USARA filing and that it was Mr. Sherman's understanding, at least that's representation by counsel based on his deposition testimony, that this email was very much directed to and exclusively about the USARA filing. That's not supported by the record, Your Honor. Well, correct, because they weren't allowed to introduce the evidence. No, I mean, as far as the deposition, he said that the deposition testimony is not included in the record, but to some extent it is. So – and if that was the connection, if that was what he presented to the judge, I don't – it seems odd that it wouldn't be in his briefing. This is the first time that we're hearing of Mr. Sherman being the one making the connection between the email and the fact that it concerned military reservists. I mean, but the most logical conclusion, not having gotten to question anybody about what this email was about, is that it was about the day before USARA filing. I mean, there isn't anything in this record that would suggest it was about something else, and if it was, wouldn't it have been great to clear that up so that Mr. Sherman could say, oh, this had to do with the softball game last week where, you know, he walked off the field after striking out. You know, I mean, wouldn't it be great if Mr. Sherman could have cleared the record up so that it doesn't look like he didn't care at all that his direct subordinate was severely criticizing and using this government email to send inappropriate emails to another subordinate employee about his constitutional right to file a claim of discrimination. Well, again, Your Honor, it's not established that that's what the email was about. And yes, it would have been certainly made this case easier if it had been quite clear as to what the intention of the email was. However, Mr. Sharpe's burden here is to establish that his military service, not Mr. Sorrell or not any other employee, affected an agency's decision making. But Mr. Sherman is what he alleges to be the pretty much critical linchpin decision maker with regard to the 14 instances in which he sought promotion. And if he can demonstrate a pattern by Mr. Sherman of a hostility towards military people, either because of their military service or because they then use that military service to file complaints against him based on discrimination, either way, that's sort of thrown into the same basket. That would be relevant, you know, wouldn't it, to show a pattern of hostility? It may have been relevant, but Mr. Sherman cannot establish prejudice because, again, he had the opportunity to explore a general line of questioning about Mr. Sherman's hostility and that he could not ask Mr. Sherman about how he felt about someone else's or his opinion about someone else's view. OK, let's just suppose that there was a governor about which there was an awful picture in a yearbook, just a hypothetical. And now let's just suppose that you tell me, well, you can ask the governor, do you have any general prejudice against people of a certain race, ethnicity or gender? And he says no, but you're not permitted to ask him about that photograph or introduce it into evidence. Seems like that would not be exactly giving somebody the full opportunity to vet the issue, doesn't it? I think it depends on what's in the photograph. If it's a photograph of something that has nothing at all to do with race, if it's a photograph of him in a park or something, then the judge, in looking at what she has in front of her, looks at it and says, OK, why are you proffering this evidence? I'm offering it to prove that this person has some sort of bias. Bias about what? Bias about people of color. OK, there's nothing in this photo that demonstrates that at all. What is it that you're offering this to prove? And if looking at what she had before her, the pre-hearing submissions, what Mr. Sharp purported that the e-mail stood for and the e-mail itself did not, in her opinion, rise to the level of being relevant to this case and relevant to the central inquiry of whether Mr. Sherman, I'm sorry, Mr. Sharp could demonstrate that his military service. Part of what I keep thinking needs to be distinguished here is the exclusion of the line of questioning that would establish what Mr. Sherman understood about the e-mail. And then on the assumption that the line of questioning took place, there could be any number of different answers and any number of different weighings of relevance so that maybe a hostility to, you know, to usurer claimants whom you believe to be making meritless claims might not be the same as a hostility to reservists. This is not a retaliation case, but we don't have any of that kind of nuanced consideration of the relevance of Mr. Sherman's understanding and reaction to the e-mail because it was all excluded essentially at the front end. Yes, Your Honor, again, after the judge considered why the evidence was being proffered, that is, I mean, so perhaps not nuanced in the sense that she allowed Mr. Sherman to go in to testify about the e-mail, but also because Mr. Tomosky was unavailable to offer exactly. He's the drafter of the e-mail. Why? Again, it's really just really Mr. Sherman's understanding that is the first critical inquiry. If he understood because he talked to Mr. Tomosky that it really wasn't about, you know, reservists but about unjustified usurer claims or was about something wholly immaterial to reserve status altogether, that might make the whole thing a non-event and non-prejudicial. But we just don't know because the inquiry was cut off. We don't know whether we don't know how Mr. Sherman viewed the e-mail, what his opinion of it was. What we do know, however, from Joint Appendix Pages 2475 to 77, it reflects several comments that he made about Mr. Sharp, who he seemed to hold in somewhat high regard. He had recommended him numerous times to be included in his top three. And he said he was a very good officer, but in each case of the promotion, it's not quite as good as the ones that he selected, right? Yes, Your Honor. And he talked about how he had the rapport with other reservists in the office on those same pages. And with respect to, you know, he talked about how other reservists had come to his office and talked to him. So there is evidence in the record that demonstrates Mr. Sherman's sort of own attitude towards reservists and their military service. I see that my time is almost up. Well, let's just assume that the court, that each one of us would have allowed this line of inquiry in regards to the e-mail and in regards to what Mr. Sherman's, you know, mental state was and any actions he did or did not take in light of that e-mail. Is it your view that even though it was erroneous to exclude it, it still wouldn't have caused any prejudice or still wouldn't have caused any harm to or affected the outcome of the case? And if that's so, then why would that be, given that the critical line of inquiry here is what was Sherman's discriminatory intent, if at all, against military reservists? To the extent the court concludes that this e-mail should have been admitted into evidence and a line of questioning should have been permitted about it, Mr. Sharpe cannot demonstrate that he was prejudiced by the exclusion of this e-mail because he was allowed to ask a wealth of questions about Mr. Sherman's own attitude towards reservists. He was able to explore a lot of territory with respect to Mr. Sherman's recommendations of Mr. Sharpe specifically. And, again, the central inquiry in Mr. Sharpe's burden is to prove, this is his initial burden by a preponderance of evidence, that somehow the agency's anti-military position affected, in this case, his promotion decision. Yeah, but see, we just don't – the problem is we can't stand in the shoes. We don't know what Sherman would have said in response to this e-mail. Like, it bothers me, if Sherman was the boss of Tomosky and Sorrell, that he took no action in response to one employee using his government e-mail to send a nasty note to another employee who had just filed a suit claiming discrimination based on his military status. You have to counsel your employees at a minimum that such behavior is inappropriate. You cannot use your government e-mail to do that. Tomosky was more supervisory as well, which is even more of a problem, having a supervisor challenge people like that. I mean, I don't know. Mr. Sherman said, which – I don't know who was in the room with him when he said this, but I'd have cringed if I were his lawyer or the government lawyer when Mr. Sherman was asked about his feelings about people who file suits of discrimination, and he claimed they were all free riders. You know what? Jack Nicholson was an excellent witness right up until the moment where he said he ordered the code red. So, I mean, Mr. Sherman has not been an excellent witness for you already, and he wasn't allowed – the SHARP team wasn't allowed to ask him what might have been the most provocative questions. So, I mean, that's the problem for me. I have trouble – it may well be that there's no prejudice, and at the end of the day, this case might come out exactly the same way. But for me, the problem is there's enough of a reason for me to be concerned about prejudice that I'm not willing to let it go. So, I mean, that's it. That's not really a question. Sorry. I understand, Your Honor. I just want to just also say that, again, Joint Appendix pages 24, 75 to 77, if you look at Mr. Sherman's testimony in its context, I mean, the free ride remark is – It's like, what the heck? What is that man doing? But in context, I think he's – and, of course, the administrative judge is in the best position to observe his demeanor and whatever motivations he may have had or displayed during his testimony. In context, it seems that he's a little – I know, and we defer to those sorts of credibility things, though I have to say her explanation didn't thrill me with the idea that I don't think he's being candid. I just think he's being hostile. Lots of people say lots of inappropriate things. They're all being candid when they say them. It doesn't mean they're not hostile. I agree. And in context, it seems that he does take issue with – I have a pretty good relationship with military reservists in my office. It's not an issue. So to the extent that this group is filing claims, I just don't see any merit there. And that supported the judge's – the way that she articulated her findings, but it's supportive, by the way. Thank you. Thank you. We respectfully request that the court affirm the administrative judge's initial decision. Thank you. You have a little bit of rebuttal time. Just because you have it doesn't mean you have to use it. I agree. I agree. But I would like to have the last word, if I could. You would prefer that over me having the last word? No. Given my last words, you think you've got something better than what I just said? If the ruling is in my favor, I would really appreciate it if you all had the last comment on it. I just wanted to point out a couple of things because I think there's a little bit of a misconception. There was other evidence. There was evidence, statistical evidence, that Mr. Sherman had a high proportion of reservists given the proximity of San Diego to military bases. He had never promoted any of them to a supervisory position. There was evidence that Mr. Sherman had had seven complaints in his office filed against him, which the judge noted but seemed to accept the premise that it was in response to that, well, if you're so great with your reservists, how come so many of them are filing against you? And his response was they want a free ride. So I think there is other indications in the record that are substantial. So the email doesn't stand on its own. It is a linchpin because I think there's a misunderstanding. What Tamaski says is somewhat irrelevant in the sense that it's an anti-military comment in our view because you can't do anything worse to a military member than call them a coward. And Tamaski certainly knew that Mr. Sorrells was a coward, and the judge knew because she took reference, judicial notice of Mr. Sorrells' USARA claim, not the facts necessarily, but she knew that Sorrells was a reservist who had filed the claim, and she saw the original appeal, which included his name. So this argument that somehow this is in a vacuum is incorrect. The reality is that the central premise to get at in a discrimination case is I have never, and I've been practicing for over 32 years, never had anyone give me the Perry Mason moment where they stood up and said, you know, Mr. Burns, you're right. I didn't want to promote these people because reservists take too much time. They're gone, and I'm just not going to promote them. That is not going to happen. So the way I look at this is we have two things, direct evidence of discriminatory intent, which you laid out in Sheehan, and indirect evidence. What is his intent? What is his motivation? What is the statistical – excuse me. I'm getting dry in the throat. What do the statistics show about his treatment? And I must disagree. Comparators as to how you treat members of the protective class are crucial. Otherwise, everyone would be a one-off, and that's what the government's, I think, the problem I have, the fundamental problem with their claim. Well, it seems to me that what isn't as significant as the Tomosky email itself is the fact that Mr. Sherman was copied on it, and what was his reaction to it as the supervisor of all involved? And that to me seems like a very significant question. Why did Tomosky feel comfortable copying his supervisor on such a derogatory email? Did Mr. Sherman create an environment in which his employees were, it's okay to say things like this to people who file claims of discrimination? And you could explore that, couldn't you, if you got to ask him questions about how he handled this after the fact. Did he call these men into the office? Did he tell Tomosky and make it clear to everyone in the office that such behavior is inappropriate, that sort of thing? Or did he say, I just thought that was Tomosky's personal view, and I think it's okay for him to use his government computer, even though he's a supervisor, and send that to other employees? So I feel like this is something you can probably figure out. Well, but there's another fact that I think you need to add, which the judge also excluded reference to, was the submission of Mr. Sherman of two reservists who went on television to talk about their mistreatment. He referred them to the Office of Professional Responsibility. He took no action against Tomosky at all, and when I asked him about it, that's when he came again to his personal opinion. There is one final point in the brief second. There is the issue of the other additional cases that the judge wouldn't allow on remand, and I do want the court to focus on that because we could have had been allowed to present that could have presented a different theory of retaliation. We could have supported his claim. Also, I think it's fundamentally unfair, particularly given that this case was sent to this ALJ initially on a remand for her misapplication of the standard. Do you have those other cases separately filed now? No, Your Honor. This goes to the issue of combining cases because it simply exhausts the party to have to file new appeals, and with all due respect, I'm not free. So I think the reason for the inclusion, like in the Perry decision where the Supreme Court came out and said, look, let's start putting all these claims in one basket. I don't think there was any reason whatsoever on that remand to exclude those additional claims. They would have been highly probative. We could have examined Mr. Sherman as to whether he felt retaliatory animus because they had filed an appeal, and we were precluded there. So I just conclude with the fact that I think that we're entitled to have a fair hearing, and I think that means that the ALJ needs to allow us to examine relevant evidence, and we weren't allowed to do that, so I ask that you reverse the remand in this case. Thank you, Your Honor. I thank both counsel for their argument. The case is taken under submission.